FIRST DIVISION
Filed: 5-29-07

1-05-0883

| | | |
|---|---|---|
| SBC HOLDINGS, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant and Cross-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CH 4009 |
| | ) | |
| TRAVELERS CASUALTY AND SURETY COMPANY, | ) | Honorable |
| | ) | Nancy J. Arnold, |
| Defendant-Appellee and Cross-Appellant. | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

The central issue in this case is whether defendant Travelers Casualty and Surety Company (Travelers) had a duty to defend its insured, plaintiff SBC Holdings, Inc. (SBC), in an underlying suit against SBC alleging racial discrimination. In 1987, City and Suburban Distributors (C&S) sued the Stroh Brewery Co. (subsequently renamed SBC) in the circuit court of Cook County. Following removal of the action to the United States District Court for the Northern District of Illinois, C&S filed a second amended complaint alleging that SBC wrongfully rejected two potential buyers for the C&S distributorship because neither of the buyers was black. In March 1997, almost nine years after the second amended complaint was filed, SBC tendered its defense of the C&S suit to the Aetna Casualty and Surety Company (predecessor to Travelers). Sixteen months later (July 1998), after SBC had won the C&S suit, Travelers refused SBC's tender of defense and denied coverage. In March 2003, SBC filed a complaint in the circuit court of Cook County seeking, among other things, a declaration that Travelers had a duty to defend

SBC in the C&S suit. In February 2005, the circuit court held that the discrimination alleged by C&S was not covered under the Travelers policy, and Travelers therefore had no duty to defend SBC. The court entered summary judgment in favor of Travelers and against SBC. SBC timely filed a notice of appeal. Travelers filed a notice of cross-appeal from the circuit court's denial of Travelers' motion to dismiss SBC's complaint on statute-of-limitation grounds. For the reasons set forth below, we affirm the judgment of the circuit court.

BACKGROUND

According to SBC's complaint for declaratory judgment, SBC was formerly known as the Stroh Brewery Company (Stroh) but changed its name to SBC in 1999. SBC's complaint states that SBC is an Arizona corporation with its principal place of business in Detroit, Michigan.

The insurance policy at issue in this case, excess indemnity (umbrella) policy No. 65 XS 2551 SCA, was issued to the Stroh Companies, Inc., by the Aetna Casualty and Surety Company (Aetna) for the period from April 1, 1986 to April 1, 1987.[1] Aetna was subsequently purchased by Travelers, and in 1997 changed its name to Travelers. The policy provided, in pertinent part:

"2.1 COVERAGE. The company will pay on behalf of the insured the ultimate net loss in excess of the applicable underlying limit which the insured shall become legally obligated to pay as damages because of

A. Personal Injury,

B. Property Damage, or

_____

[1]The underlying C&S complaint alleged discrimination by Stroh in January and February 1987, which is within the policy period.

2

C. Advertising Offense

to which the policy applies, caused by an occurrence anywhere in the world ***.

* * *

2.3 DEFENSE OF SUITS NOT COVERED BY 0THER INSURANCE

(a) The company shall defend any suit seeking damages which are not payable on behalf of

the insured under the terms of the policies of Underlying Insurance described in Section 1

or any other available insurance

(1) because such damages are not covered thereunder ***

but which are payable under the terms of Section 2.1 *** even if any of the allegations of

the suit are groundless, false or fraudulent ***.

* * *

Section 5. DEFINITIONS

* * *

5.10 'occurrence' means

***

(2) with respect to advertising offense and personal injury respectively: an offense

described in the definition of those terms in this policy;

5.11 'personal injury' means bodily injury and injury arising out of one or more of the

following offenses committed during the policy period: false arrest, detention or

imprisonment, malicious prosecution, wrongful entry or eviction or other invasion of the

right of private occupancy, humiliation or *discrimination because of race*, religion, age,

sex or physical disability (*unless committed by or at the direction or the Insured*, or unless insurance therefor is prohibited by law) ***." (Emphases added.)

In the mid-1980s, C&S was an independently owned wholesale distributor of Stroh's products in the Chicago area. According to C&S's second amended complaint, sales of Stroh's products constituted about two-thirds of C&S's total sales. The following summary of events leading to the filing of C&S's second amended complaint is based, in part, on the allegations in that complaint.

C&S distributed Stroh products pursuant to a written wholesaler agreement. In September 1986 Stroh attempted to terminate this agreement because of an allegedly unauthorized control change at C&S. Following negotiations between the parties, it was agreed–pursuant to a letter agreement dated September 15, 1986–that C&S would continue as a Stroh distributor for 90 days while attempting to sell its business to a purchaser acceptable to Stroh. During the fall of 1986, C&S solicited a number of bids from potential purchasers, including Vierk Distributing Company and Nelson Carlo Enterprises, Inc. Vierk and Carlo each offered $5 million for all of C&S's distributorship rights.

According to the second amended complaint, C&S submitted the proposals to Stroh, which rejected them even though Vierk was already a Stroh distributor and had been approved by Stroh. In a letter dated February 4, 1987, Stroh group vice president Kenneth A. Tippery explained Stroh's objections to Vierk, Carlo and a third potential purchaser, Archie Mitchell. With regard to Vierk, the letter stated, in pertinent part:

"As you have known from the beginning of the C&S liquidation process, we have required three characteristics of prospects for consideration: *** (2) minority-owned and operated, if not wholly at least to a major extent."

The letter added that Stroh had "just today" received C&S's latest Vierk proposal, which was "unacceptable" for a number of reasons. "First, we require an active, involved minority owner-operator ***." (Emphasis in original.) The letter, which was printed on Stroh letterhead, further stated "for the record" that one of the positive characteristics of the only candidate that Stroh deemed acceptable (Thomas Rand, owner of Beverage Affiliates, Inc.) was that he was a "[m]ember of the dominant population in the C&S market."

According to C&S's second amended complaint, Stroh insisted that C&S negotiate to sell to Beverage Affiliates (Rand). C&S further alleged that, if C&S did not sell to Rand, Stroh threatened to exercise its rights under the letter agreement to buy back its products for $2.9 million and terminate C&S's franchise. As a result, C&S filed suit in the circuit court of Cook County seeking injunctive relief to bar Stroh from terminating C&S's distributorship. The circuit court issued a temporary restraining order prohibiting Stroh from terminating or interfering with C&S's rights as a franchisee or taking action to undermine C&S as the distributor for its territory.

As previously noted, the case was subsequently moved to federal court. On March 12, 1987, the district court granted a preliminary injunction barring Stroh "from proceeding with a race-based selection." In reaching this decision, the district court found, among other things, that "race was clearly the dominant factor in the selection process."

5

C&S alleged further that, after the preliminary injunction was issued, C&S negotiated a deal with Rand for sale of the distributorship. However, Rand refused to go forward with the purchase. According to C&S, at this point prospective buyers were reluctant to negotiate with C&S, fearing rejection by Stroh or potential involvement in litigation. As a result, C&S alleged, its sales declined, along with the value of its franchise. Eventually, after more than a year of negotiations, C&S sold its distribution rights to Vierk for an amount that was allegedly about $1 million less than Vierk would have paid before Stroh rejected the earlier bid. During that interval, C&S claimed that it was forced to borrow substantial sums to keep its business open.

The second amended complaint, which was filed on June 9, 1988, contained four counts, each of which was based on alleged racial discrimination. Count I claimed a breach of contract in that SBC used a race-based factor in rejecting the Vierk and Carlo offers, in violation of the letter agreement with C&S. Count II alleged that Stroh violated the Illinois Beer Industry Fair Dealing Act (now see 815 ILCS 720/1 *et seq.* (West 2004)) by unreasonably (based on race) withholding its approval of the sale of C&S's assets. In count III, C&S alleged that Stroh tortiously interfered with the formation of contract by wrongfully rejecting the Vierk and Carlo offers on the basis of race. Count IV alleged a civil rights violation in that Stroh rejected the sale to either Vierk or Carlo based on the race of the potential buyers. With regard to Vierk, count IV stated: "Stroh disapproved the C&S sale of some or all of its assets to Vierk on the ground[] that Richard Vierk, president and owner of Vierk Distributing Company, is a white person." A similar allegation was made regarding Carlo: "Stroh disapproved C&S' sale of some or all of its assets to Nelson Carlo Enterprises, Inc., on the ground that Nelson Carlo, president and owner of Nelson Carlo

6

Enterprises, Inc.: a. is not a black person; b. is an Hispanic-American." The second amended complaint sought $3.25 million in damages based on the following two allegations: (1) "C&S was forced to sell its business for approximately $1 million less than it would have received if Stroh had not wrongfully rejected the Vierk and Carlo offers," and (2) "C&S was forced to borrow approximately $2.25 million to remain in business in order to negotiate a subsequent sale."

On March 11, 1997, almost nine years after the filing of C&S's second amended complaint, Stroh tendered its defense of the C&S suit to Aetna. Two months later, Stroh won the C&S suit. *City & Suburban Distributors-Illinois, Inc. v. Stroh Brewery Co.*, No. 87 C 1409 (N.D. Ill. 1997). The district court granted summary judgment in favor of Stroh on the ground that C&S suffered no damages as a result of racial discrimination. This decision was subsequently affirmed. *City & Suburban Distributors Illinois, Inc. v. Stroh Brewery Co.*, 142 F. 3d 439 8 (7th Cir. April 30, 1998).

In a letter dated July 27, 1998, Travelers declined Stroh's tender of defense in the C&S suit. With regard to the insurance policy at issue, excess indemnity (umbrella) policy No. 65 XS 2551 SCA, Travelers stated that C&S, in its second amended complaint, "do[es] not claim damages on account of *** personal injury *** caused by an occurrence as each of those terms is defined within the policy."

On March 4, 2003, SBC filed its complaint for declaratory judgment in the circuit court of Cook County. In its complaint, SBC sought, among other things, a declaration that Travelers owed and breached a duty to defend SBC in the underlying federal action brought by C&S. According to SBC, it spent at least $1,039,009 for its successful defense of the C&S suit. SBC

7

further alleged that (1) it was a named insured under the umbrella policy at issue "because Stroh [subsequently renamed SBC] was a wholly owned subsidiary of The Stroh Companies, Inc. [the named insured] during the policy period"; (2) the policy covered "discrimination because of race," and C&S's allegations of racial discrimination (in the second amended complaint) therefore triggered Travelers' duty to defend SBC in the underlying suit; and (3) Travelers breached its duty to defend.

On April 18, 2003, Travelers filed a motion to dismiss SBC's complaint on the ground that it was untimely filed. Travelers pointed to section 13-206 of the Code of Civil Procedure (735 ILCS 5/13-206 (West 2002)), which provides, in pertinent part: "actions on *** written contracts *** shall be commenced within 10 years next after the cause of action accrued." According to Travelers, SBC's cause of action on the Travelers policy (a written contract) accrued when SBC received C&S's second amended complaint. The C&S complaint was filed on June 9, 1988, but SBC's declaratory judgment complaint against Travelers was not filed until March 4, 2003, "14 years and 9 months after accrual." In September 2003 the circuit court denied Travelers' motion to dismiss and found that SBC's suit was timely filed. Travelers subsequently moved to certify for interlocutory appeal, pursuant to Supreme Court Rule 308(a) (155 Ill. 2d R. 308(a)), the question of whether Travelers' motion to dismiss was properly denied. In December 2003 the circuit court denied Travelers' Rule 308 motion.

In May 2004 Travelers moved for summary judgment. In its motion, Travelers pointed to its policy language defining "personal injury" as "injury arising out of one or more of the following offenses committed during the policy period: *** *discrimination because of race*, religion, age,

8

sex or physical disability (*unless committed by or at the direction of the Insured*, or unless insurance therefore is prohibited by law)." (Emphasis added.) Based on this language, Travelers asserted that it was entitled to summary judgment as a matter of law "because the underlying C&S Second Amended Complaint does not allege a 'personal injury' offense which is covered by the Travelers policy, but rather alleges discrimination because of race which was committed by or at the direction of Strohs." In its memorandum in support of its motion for summary judgment, Travelers elaborated on its argument that the allegations in C&S's second amended complaint did not trigger Travelers' duty to defend. Travelers stated: "[E]ach cause of action in the Second Amended C&S Complaint is based upon a deliberate business decision by Stroh to employ a race-based selection criteri[on] in connection with C&S's attempted sale of its Stroh franchise." Travelers pointed again to the insurance policy's definition of "personal injury" as "injury arising out of," among other things, "discrimination because of race *** unless committed by or at the direction of the Insured." Travelers stated: "The allegations of the Second Amended C&S Complaint clearly fall outside of that definition."

On September 24, 2004, SBC filed a cross-motion for summary judgment. SBC acknowledged that "there are no material fact questions" and argued that SBC was entitled to judgment as a matter of law "because Travelers breached its duty to defend and so must pay for all of Stroh's defense costs in the underlying C&S suit." SBC repeated its allegation from its declaratory judgment complaint that C&S sought damages against Stroh for racial discrimination and that this triggered Travelers' duty to defend the C&S suit. SBC also alleged that Travelers' insurance for discrimination was ambiguous and therefore "must be construed in favor of the duty

9

to defend." According to SBC, Travelers "promises insurance for discrimination but then takes it all away for discrimination 'committed by or at the direction of the insured.'" SBC also alleged that Michigan insurance law applied to Stroh's coverage and that, under Michigan law, Travelers was "required to pay for all $1.1 million of Stroh's defense costs incurred from the filing of the C&S suit."

Pursuant to an agreed order entered in November 2004, two questions were at issue in the summary judgment motions: (1) whether the allegations in the underlying C&S complaint triggered Travelers' duty to defend SBC in the C&S suit, and (2) whether Travelers was liable to SBC for defense costs which SBC incurred prior to notifying Travelers of the C&S suit.

On February 24, 2005, the circuit court heard arguments on the cross-motions for summary judgment, and entered summary judgment in favor of Travelers and against SBC. The court explained that it had compared C&S's second amended complaint with "the insuring agreement covering personal injury" and concluded that "on its face there is no potential for coverage of that underlying [C&S] action under this policy." The court stated:

"What we have here that's clearly shown by the second amended complaint in the underlying action and its exhibits, which includes that [February 4, 1987,] letter from the vice president, is that that was an action, an action of discrimination committed by and at the direction [of Stroh] *** it was a corporate act, a corporate policy of affirmative action."

The circuit court expressly held that Travelers had no duty to defend the C&S suit. Because of this decision, the court did not address the second question at issue in the summary judgment

motions: whether Travelers was liable for defense costs incurred by SBC prior to SBC's notifying Travelers of the underlying C&S suit.

SBC timely filed a notice of appeal. Travelers cross-appealed from the circuit court's September 2003 denial of Travelers' motion to dismiss SBC's complaint on statute-of-limitation grounds.

ANALYSIS

On appeal, SBC argues, as it did below, that: (1) the allegations of race discrimination in C&S's second amended complaint triggered Travelers' duty to defend SBC in the C&S suit, and (2) Travelers is required to pay SBC the defense costs which SBC incurred *prior* to notifying Travelers of the C&S suit, as well as the defense costs incurred after this notification.

With regard to SBC's first argument, the circuit court, as noted, granted summary judgment in favor of Travelers, concluding that Travelers owed no duty to defend SBC. "Summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits on file, when taken together in the light most favorable to the nonmovant, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Gawryk v. Firemen's Annuity & Benefit Fund of Chicago*, 356 Ill. App. 3d 38, 41 (2005). Where, as here, "the parties have filed cross-motions for summary judgment, they agree that no genuine issue as to any material fact exists and that only a question of law is involved, and they invite the court to decide the issue based on the record." *Gawryk*, 356 Ill. App. 3d at 41. We review a circuit court's ruling on a motion for summary judgment *de novo*. *Gawryk*, 356 Ill. App. 3d at 41.

11

In determining whether an insurer has a duty to defend its insured, a court looks to the allegations in the underlying complaint and compares them to the relevant provisions of the insurance policy. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 107-08 (1992). "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises." *Outboard Marine*, 154 Ill. 2d at 108. However, if it is clear from the face of the complaint that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage, an insurer may properly refuse to defend. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 73 (1991), quoted in *State Farm Fire & Casualty Co. v. Hatherley*, 250 Ill. App. 3d 333, 336 (1993). "[W]here the language of an insurance policy is clear and unambiguous, it will be applied as written." *Hatherley*, 250 Ill. App. 3d at 337. The construction of an insurance policy presents a question of law that is reviewed *de novo*. *Outboard Marine*, 154 Ill. 2d at 108.

In the second amended complaint, C&S alleged that, during the fall of 1986, C&S solicited a number of bids from potential purchasers of C&S's distributorship. Included among these bidders were the Vierk Distributing Company and Nelson Carlo Enterprises, Inc., each of which offered $5 million for all of C&S's distributorship rights. C&S further alleged that it submitted these proposals to Stroh, but Stroh rejected them even though Vierk was already a Stroh distributor and had been approved by Stroh.

In a letter to C&S dated February 4, 1987, Stroh group vice president Kenneth A. Tippery explained Stroh's objections to Vierk, Carlo and a third potential purchaser, Archie Mitchell. With regard to Vierk, the letter stated, in pertinent part:

12

"As you have known from the beginning of the C&S liquidation process, we have required three characteristics of prospects for consideration: *** (2) minority-owned and operated, if not wholly at least to a major extent."

The letter added that Stroh had "just today" received C&S's latest Vierk proposal, which was "unacceptable" for a number of reasons. "First, we require an active, involved minority <u>owner-operator</u> ***." (Emphasis in original.)   The letter further stated "for the record" that one of the positive characteristics of the only candidate that Stroh deemed acceptable (Thomas Rand, owner of Beverage Affiliates, Inc.) was that he was a "[m]ember of the dominant population in the C&S market."

C&S's second amended complaint contained four counts, each of which was based on alleged racial discrimination.  Specifically, each count was predicated on Stroh's alleged improper use of a race-based factor in rejecting the Vierk and Carlo offers.  Count IV, which claimed a civil rights violation, stated:

"21. Stroh disapproved the C&S sale of some or all of its assets to Vierk on the ground[] that Richard Vierk, president and owner of Vierk Distributing Company, is a white person.

22. Stroh disapproved C&S' sale of some or all of its assets to Nelson Carlo Enterprises, Inc., on the grounds that Nelson Carlo, president and owner of Nelson Carlo Enterprises, Inc.:

a. is not a black person;

13

b. is an Hispanic-American."

Under the relevant policy language, Travelers promised to cover personal injury "to which this policy applies, caused by an occurrence anywhere in the world." An "occurrence," as related to "personal injury," was defined as "an offense described in the definition[] of [personal injury] in this policy." "Personal injury," in turn, was defined as "injury arising out of *** discrimination because of race, religion, age, sex or physical disability (unless committed by or at the direction of the Insured, or unless insurance therefor is prohibited by law)."

C&S's second amended complaint appears to allege deliberate, business-driven racial discrimination committed by Stroh. It seems clear that such discrimination falls outside the scope of the relevant policy language, whose plain, ordinary meaning is that there is no coverage for discrimination committed by or at the direction of Stroh. This was the view of the circuit court, which, after hearing argument on the parties' cross-motions for summary judgment, stated:

"I am going to grant the insurer's motion for summary judgment and deny the insured's [motion] on the basis that by reading the second amended complaint and its attachments in the underlying action, and comparing that to the insuring agreement covering personal injury, that on its face there is no potential for coverage of that underlying action under this policy."

Notwithstanding the foregoing, SBC contends that Travelers' relevant policy language is ambiguous and therefore must be construed in favor of coverage. According to SBC, Travelers' insurance policy promises coverage for discrimination but then, by prohibiting coverage for

14

discrimination "committed by or at the direction of the Insured," takes back what the policy had promised. In SBC's view, Travelers is essentially saying: "[W]e cover you for discrimination unless you do it." SBC argues that this is contradictory and ambiguous.

In making this argument, SBC relies primarily on *North Bank v. Cincinnati Insurance Cos.*, 125 F.3d 983 (6th Cir. 1997), a federal court of appeals case that predicts Michigan law with regard to the type of liability limitation at issue here.[2] *North Bank* found ambiguous an insurance policy provision barring coverage for discrimination "committed by or at your [the named insured's] direction." *North Bank*, 123 F. 3d at ___. According to defendant in the case at bar, *North Bank* held "that the exclusion for 'discrimination committed by or at your direction' forfeits all coverage for 'intentional' and 'unintentional' discrimination, leaving the insured with nothing." We disagree with this interpretation of the language in question. Here, Travelers acknowledges that, under its version of this language, there is potential coverage for negligent or vicarious discrimination. In its brief to this court, Travelers asserts: "Corporate liability based *** on its 'negligent supervision' or [imposed] 'vicariously' for the acts of its personnel would potentially fall within the 'personal injury' definition, because the discrimination itself was not 'committed by or at the direction of the Insured.'" Travelers adds that "disparate impact" claims against the insured also would potentially fall within its policy's "personal injury" definition. In our view, Travelers' policy language barring coverage for discrimination "committed by or at the direction of the Insured" does not eliminate coverage for all types of unintentional discrimination.

_____

[2]SBC acknowledges that *North Bank* "is the only Michigan authority on point" regarding this issue.

15

We reject SBC's argument, based on *North Bank*, that Travelers' liability limitation is ambiguous.

SBC next points to the rule of the last antecedent, which provides:

"[R]elative or qualifying words or phrases in a statute serve only to modify words or phrases which are immediately preceding. They do not modify those which are more remote." *People v. Davis*, 199 Ill. 2d 130, 138 (2002).

SBC applies this rule to the Travelers policy's definition of "personal injury," which lists several types of offenses and ends with the restrictive parenthetical at issue: "(unless committed by or at the direction of the Insured *** )." SBC notes that discrimination because of "physical disability" is the last type of discrimination listed before the parenthetical, and concludes that, based on the rule of the last antecedent, the limiting parenthetical therefore applies only to discrimination because of physical disability and not to the four prior types of discrimination, including race discrimination. SBC acknowledges that the circuit court below interpreted the limiting parenthetical as applying to all five types of discrimination, rather than simply to the last type. SBC asserts that the circuit court erred in its interpretation. SBC adds that, regardless of which interpretation is correct, the rule of the last antecedent "shows that Travelers' wording can reasonably be read either way," and the parenthetical limitation thus is ambiguous. We find this argument unpersuasive.

As previously indicated, the definition of "personal injury" in Travelers' policy states, in pertinent part:

16

"'[P]ersonal injury' means bodily injury and injury arising out of one or more of the following offenses committed during the policy period: false arrest, detention or imprisonment, malicious prosecution, wrongful entry or eviction or other invasion of the right of private occupancy, humiliation or discrimination because of race, religion, age, sex or physical disability (unless committed by or at the direction of the Insured ***)."

We agree with the circuit court that the last antecedent in this instance is "discrimination," which is the last in a series of offenses listed in the definition prior to the parenthetical. If we were to adopt SBC's reading, we would be forced to conclude, illogically, that Travelers chose to provide coverage for discrimination because of race, religion, age, or sex, even if committed by or at the direction of the insured, but nevertheless chose not to provide coverage for discrimination because of physical disability if the discrimination were committed by or at the direction of the insured. No plausible argument is offered to explain such a decision on the part of Travelers.

Our conclusion here is supported by *People v. Davis*, 199 Ill. 2d 130 (2002), a case cited by SBC. In *Davis*, our supreme court applied the rule of the last antecedent to section 33A-1(b) of the Criminal Code of 1961 (720 ILCS 5/33A-1(b) (West 1992)), which defined a category I weapon:

"A category I weapon is a pistol, revolver, rifle, shotgun, spring gun, or any other firearm, sawed-off shotgun, a stun gun or taser as defined in paragraph (a) of Section 24-1 of this Code, knife with a blade of at least 3 inches in length, dagger, dirk, switchblade knife,

stiletto, or any other deadly or dangerous weapon or instrument of like character." 720

ILCS 5/33A-1(b) (West 1992).

The supreme court interpreted the concluding words, "or any other deadly or dangerous weapon or instrument of like character," as applying to the entire class of blade-type weapons listed in the statute ("knife with a blade of at least 3 inches in length, dagger, dirk, switchblade knife, stiletto") and not just to "stiletto." *Davis*, 199 Ill. 2d at ___.

In sum, we conclude that the Travelers policy's liability limitation barring coverage for discrimination "committed by or at the direction of the Insured" is not ambiguous. Anticipating our decision on this issue, SBC argued, in its briefs to this court, that Michigan had the most significant contacts with the insurance policy at issue and that, under Illinois choice of law rules, Michigan law therefore controlled Travelers' policy coverage in this case. According to SBC, "Michigan holds that Travelers' discrimination insurance is ambiguous and so must be construed in favor of SBC's right to a defense of the underlying C&S suit."

Before a court can apply a choice-of-law analysis to determine which state's law applies to the dispute, it must first determine if there is a conflict in the laws of the two states. *McGrew v. Pearlman*, 304 Ill. App. 3d 697, 701 (1999); *Malatesta v. Mitsubishi Aircraft International, Inc.*, 275 Ill. App. 3d 370, 374 (1995). A conflict exists if the difference in laws will result in a difference in outcome. *McGrew*, 304 Ill. App. 3d at 701; *Malatesta*, 275 Ill. App. 3d at 374. If the law of the jurisdictions in question is essentially the same on the disputed point, there is no need to apply a choice-of-law analysis. *Wreglesworth v. Arctco, Inc.*, 316 Ill. App. 3d 1023, 1028

(2000). In the absence of a conflict, Illinois law applies as the law of the forum. *Dearborn Insurance Co. v. International Surplus Lines Insurance Co.*, 308 Ill. App. 3d 368, 373 (1999).

SBC argues that it has sufficiently alleged a conflict between Illinois and Michigan law. In support of this contention, SBC points to *North Bank v. Cincinnati Insurance Cos.*, 125 F.3d 983 (6th Cir. 1997), a federal court of appeals case predicting Michigan law with regard to the liability limitation wording at issue in the case at bar. As previously noted, *North Bank* found ambiguous a policy exclusion worded similarly to Travelers' provision barring coverage for discrimination "committed by or at the direction of the Insured." In reaching this conclusion, *North Bank* pointed to the doctrine of reasonable expectations. Under this doctrine, a court grants coverage if the policyholder, upon reading the contract language, has a reasonable expectation of coverage. *North Bank*, 125 F.3d at 987. According to the court of appeals in *North Bank*, the plaintiff bank "reasonably expected that the [underlying] discrimination claim would be covered by the umbrella policy." *North Bank*, 125 F.3d at 987. In the court's view, "the defendant insurance company should not be permitted to sell the bank a policy covering discrimination claims and then to refuse to cover garden variety discrimination claims." *North Bank*, 125 F.3d at 987.

To the extent that *North Bank* predicted Michigan law with regard to the policy language at issue here, it has been undermined by *Wilkie v. Auto-Owners Insurance Co.*, 469 Mich. 41, 664 N.W. 2d 776 (2003). In *Wilkie*, the Michigan Supreme Court abandoned the rule of reasonable expectations, concluding that it was "invalid as an approach to contract interpretation." *Wilkie*, 469 Mich. at 52, 664 N.W.2d at 782. In view of the decision in *Wilkie*, we conclude that *North*

*Bank* is insufficient authority to support SBC's allegation of a conflict between Michigan and Illinois law. We reject SBC's argument that Michigan law controls Travelers' policy coverage in this case.

SBC argues, in the alternative, that the C&S second amended complaint alleged vicarious discrimination and that this allegation triggered Travelers' duty to defend. SBC asserts that Travelers has admitted coverage for vicarious liability.

According to SBC, "[t]he C&S allegations target the personal bias of Stroh's group vice-president (Kenneth Tippery)," the author of the February 4, 1987, letter explaining Stroh's objections to the proposed purchasers submitted by C&S, including Vierk and Carlo. SBC contends there is evidence in the record that Tippery, in explaining the reasons for rejecting Vierk and Carlo, was acting on his own, in contravention of Stroh corporate policy.

The February 4 letter stated, in pertinent part:

"As you have known from the beginning of the C&S liquidation process, we have required three characteristics of prospects for consideration: *** (2) minority-owned and operated, if not wholly at least to a major extent."

The letter added that "we have just today received" C&S's latest Vierk proposal, which, the letter stated, "is unacceptable to us" for a number of reasons. "First, we require an active, involved minority <u>owner-operator</u> ***." (Emphasis in original.) The letter, which was printed on Stroh letterhead, further stated "for the record" that one of the positive characteristics of the only

candidate who was deemed acceptable (Thomas Rand, owner of Beverage Affiliates, Inc.) was that he was a "[m]ember of the dominant population in the C&S market."

SBC concedes that "Mr. Tippery's February 4 correspondence says 'we' require minority ownership." In other words, the letter uses the third-person plural "we" rather than the first-person singular "I." SBC attempts to avoid the obvious implications of the use of "we" by stating: "Mr. Tippery used the pronoun 'we' but does not say who shares his motive for minority ownership." SBC adds that Tippery does not say in the letter that minority ownership "is a Stroh corporate policy [or] a Stroh corporate requirement." Finally, SBC acknowledges that the letter "is written on Stroh stationery," but adds that it is "simply signed 'Kenneth A. Tippery, Group Vice President.'"

We find SBC's argument that Tippery was acting in contravention of corporate policy unpersuasive, as did the circuit court. During the hearing on the parties' cross-motions for summary judgment, the circuit court rejected any argument that the discrimination alleged by C&S was vicarious. The court stated, in pertinent part:

> "This was a company policy. That letter came right out and said our company policy; me, the vice president speaking on behalf of the company, I'm telling you that our company policy is to base these things on race. That's not the supervisor who fires somebody because he doesn't like somebody because he's black. This is a corporate act. This is an expression of corporate policy."

21

In sum, we conclude that, in the case at bar, Travelers' limiting parenthetical denying coverage for discrimination "committed by or at the direction of the Insured" is not ambiguous and must be applied as written (*Wilkin*, 144 Ill. 2d at 74)). C&S's second amended complaint clearly alleged, on its face, deliberate, business-driven race discrimination "committed by or at the direction of" Stroh. The facts alleged do not fall, even potentially, within the policy's coverage, and Travelers therefore had no duty to defend SBC in the underlying C&S suit. See *Outboard Marine*, 154 Ill. 2d at 108. Travelers was entitled, as a matter of law, to summary judgment. We affirm the circuit court's awarding of summary judgment in favor of Travelers and against SBC.

Because of our disposition in this case, we need not address SBC's argument that Travelers must pay the defense costs which SBC incurred *prior* to notifying Travelers of the C&S suit, as well as the costs incurred after this notification. We also need not consider Travelers' cross-appeal from the circuit court's denial of Travelers' motion to dismiss SBC's complaint on statute-of-limitation grounds.

Finally, we note that Travelers filed a motion requesting that we strike portions of SBC's opening appellant brief for violation of Supreme Court Rule 341(h)(2) (210 Ill. 2d R. 341(h)(2)). Rule 341(h)(2) spells out what is to be included in the introductory paragraph in an appellant's brief describing the nature of the action. In its motion, Travelers argues that the introductory "nature of the action" section of SBC's brief improperly includes "argumentative matters" in violation of Rule 341(h)(2). We agree with Travelers that portions of this introductory section of SBC's brief contain argument that should not have been included in this section. To the extent

22

that any improper argument was included, we have not considered it in reaching our decision. We therefore deny Travelers' motion to strike as moot.

CONCLUSION

The circuit court's entering of summary judgment in favor of Travelers and against SBC is affirmed.

Affirmed.

McBRIDE, P.J. and CAHILL, J., concur.